# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **STEVEN MICHAEL WOODS,** | § | |
| **Petitioner,** | § | |
| **vs.** | § | **No. 6:06cv344** |
| **NATHANIEL QUARTERMAN, Director**, | § | |
| **Texas Department of Criminal Justice,** | | |
| **Correctional Institutions Division,** | § | |
| **Respondent**. | | |

## MEMORANDUM OPINION AND ORDER

Petitioner Steven Michael Woods ("Woods"), an inmate confined to the Texas Department of Criminal Justice, Institutional Division, filed an application for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Woods challenged his capital murder conviction and death sentence imposed by the 367th Judicial District Court of Denton County, Texas, in cause No. F-2002-0541-E, styled *The State of Texas vs. Steven Michael Woods.* Having considered the circumstances alleged and authorities cited by the parties, and having reviewed the record, the Court **DENIES** the application.

## BACKGROUND

**Facts**

Early in the morning of May 2, 2001, two golfers driving down Boyd Road at the Tribute Golf Course near The Colony, Texas, found the bodies of Ron Whitehead and Beth Brosz. Both had been shot in the head and had their throats cut. Whitehead was dead; Brosz was still alive but after receiving medical care, she died the next day. That evening, police received several anonymous tips

that Woods was involved in the killings, along with one Marcus Rhodes. Detectives interviewed Woods, who admitted to being with the victims the night before their bodies were found. He said that he and Rhodes had agreed to lead Whitehead and Brosz to a house in The Colony owned by someone named "Hippy," but that their two vehicles became separated during the trip, so he and Rhodes returned to the Deep Ellum section of Dallas. Woods was not arrested as a result of his interview. Detectives then interviewed Rhodes, and after a search of his car revealed items belonging to Whitehead and Brosz, Rhodes was arrested.

Woods left the Dallas area, traveling to New Orleans, Idaho and California, where he was finally arrested. Several witnesses testified that before the killings he told them about his plan to commit the murders, and after the killings, he told them about his participation in them.

**Procedural History**

On April 18, 2002, Woods was indicted for capital murder under TEX. PENAL CODE § 19.03(a)(7), for the killing of more than one individual during the same criminal transaction. On August 16, 2002, after a jury trial, he was found guilty and following a separate punishment determination hearing, the jury found that there was a probability that Woods would commit acts of criminal violence which would pose a continuing threat to society, found that Woods caused the death of the victims, intended to kill the victims, or anticipated that their lives would be taken, and found that, taking into account the circumstances of the crime, as well as Woods's personal culpability, character and background, there were not sufficient mitigating circumstances to recommend the imposition of a penalty less than death. In accordance with state law, the trial judge sentenced Woods to death.

Woods's conviction and sentence were affirmed by the Texas Court of Criminal Appeals, *see Woods v. State*, 152 S.W.3d 105 (Tex. Crim. App. 2004), and the Supreme Court of the United States denied his petition for a writ of *certiorari*. *See Woods v. Texas*, 544 U.S. 1050 (2005). Woods then filed an application for state post-conviction relief. The trial court entered findings of fact and conclusions of law and recommended that his application be denied, and the Texas Court of Criminal Appeals adopted those findings, conclusions and recommendations. *See Ex parte Woods*, 176 S.W.3d 224 (Tex. Crim. App. 2005). On September 6, 2006, Woods filed an application for a writ of *habeas corpus* in this Court.

## APPLICABLE LAW

Because Woods's application for *habeas corpus* was filed after 1996, the Anti Terrorism and Effective Death Penalty Act ("AEDPA") applies to his claims. Under the AEDPA, a state prisoner seeking to raise claims in a federal petition for *habeas corpus* ordinarily must fairly present those claims to the state court and thereby exhaust his state remedies. *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001), *cert. denied sub nom. Martinez v. Cockrell*, 534 U.S. 1163 (2002). If an applicant raises a claim in his federal *habeas corpus* application that was not fairly presented to the state courts, the federal court will attempt to allow the applicant to return to state court and present the claim to the state court in a successive petition, either by dismissing the entire petition without prejudice, *see Rose v. Lundy*, 455 U.S. 509, 520-22 (1982), or by staying the federal proceedings, s*ee Rhines v. Weber*, 544 U.S. 269, 278 (2005). If it is entirely clear that the state court would refuse to consider the merits of the claim if the applicant were to return to state court and present it in a successive petition, the federal court will treat the unexhausted claims as if the state court had already refused to hear them on procedural grounds. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th

Cir. 2001).  If it is not entirely clear that the state court would refuse to hear a successive petition containing the new claims, however, the federal court will allow the state court the first opportunity to consider them.  *See Wilder v. Cockrell,* 274 F.3d 255, 262-63 (5th Cir. 2001).

Federal courts generally do not review procedurally defaulted claims unless the applicant can establish either that he had good cause for failing to fairly present his claims, and he would be prejudiced by not being given an opportunity to do so in the federal court, or that the federal court's failing to address the claims on their merits would result in a fundamental miscarriage of justice, because the petitioner is actually innocent of the offense.  *See Coleman v. Thompson,* 501 U.S. 722, 749-50 (1991); *Finley v. Johnson,* 243 F.3d 215, 220 (5th Cir. 2001).

If the state court denied the claim on its merits, a federal court may only grant relief if the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, *see* 28 U.S.C. § 2254 (d)(1), or the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, *see* 28 U.S.C. § 2254 (d)(2).  In reviewing a state court decision, this Court reviews questions of law and mixed questions of law and fact under section 2254(d)(1) and reviews questions of fact under section 2254(d)(2).  The state court's findings of fact are presumed to be correct, and the applicant has the burden of rebutting this presumption of correctness by clear and convincing evidence.  *Richardson v. Quarterman,* 537 F.3d 466, 472-73 (5th Cir.  2008), *cert. denied*, 129 S.Ct. 1355 (2009).  Claims presented to the state court but not adjudicated by that court, and factual issues not determined by the state court are both determined *de novo*.  *See Miller v. Johnson,* 200 F.3d 274, 281 n.4 (5th Cir.), *cert. denied,* 531 U.S. 849 (2000).

If the state court based its decision on the alternative grounds of procedural default and rejecting the claim on its merits, the general rule in this circuit is that a federal court must, in the absence of good cause and prejudice, or a fundamental miscarriage of justice, deny relief because of the procedural default, *see Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005), *cert. denied*, 546 U.S. 1177 (2006), but the rule is not absolute; a court can look past the question of procedural default if the claims can be resolved more easily on the merits. *See Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir.), *cert. denied*, 541 U.S. 1087 (2004).

To prevail on a claim on ineffective assistance of counsel, a defendant must establish by a preponderance of the evidence that his counsel's actions fell below objective standards of reasonableness under prevailing professional norms and that but for counsel's unreasonable actions there is a reasonable probability that the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

## ANALYSIS OF CLAIMS

**Ineffective assistance of trial counsel: failure to investigate mitigating evidence**

Woods's first claim is that his trial counsel rendered ineffective assistance by failing to adequately investigate and present evidence of his background, character, and personal circumstances in the punishment determination phase of his trial. This claim was denied on the merits by the state court, *see Ex parte Woods*, 176 S.W.3d 224, 226-28 (Tex. Crim. App. 2005), so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Woods first contends that his defense counsel should have interviewed friends and acquaintances who could have testified to his redeeming qualities. Defense counsel pointed out in his affidavit that he had reviewed an on-line diary, which had been kept by one of Woods's girlfriends, and in his opinion Woods would have appeared even less sympathetic if the jury learned the details of his violent and drug-fueled relationship with her. This would have lent credence to the prosecution's warning to him that numerous such witnesses were prepared to testify in rebuttal about Woods's history of violence, bad acts, and bad character. In light of this evidence, the Court cannot say that the state court's determination that Woods's defense counsel's decision not to further investigate Woods's friends and acquaintances with the goal of getting them to testify to his positive character traits was unreasonable.

Woods next contends that his counsel should have more fully investigated, and then presented, evidence of his mental illnesses. Defense counsel provided Woods's psychiatric treatment reports to, and had Woods examined by, Dr. Kelly Goodness, a psychologist who was their consulting expert. Since there is no indication that Dr. Goodness told counsel that further investigation into Woods's mental health issues was necessary, or that such evidence would bolster the defense, the state court's conclusion that his counsel's failure to do so did not constitute deficient performance was not unreasonable.

Woods's final contention is that his counsel should have called family members to testify as to his upbringing. In investigating Woods's background, the defense found Woods's own input to be unhelpful. They obtained information about his upbringing from psychiatric records, which were generated when Woods was hospitalized on a few occasions between the ages of 13-18. They spent several hours interviewing Woods's mother, tried to interview his father (who refused to help), and

spent six to eight hours interviewing unnamed witnesses.

Based upon this preliminary investigation into Woods's background, as well as discussions with the prosecution, defense counsel stated in his affidavit that he was aware of a litany of incidents of bad behavior and bad character in Woods's past, that the prosecution was aware of it, and had many witnesses, who could testify to these characters and behaviors, and that the more mitigating evidence he attempted to introduce, the more bad behavior and bad character evidence the prosecution would offer in rebuttal.[1] Under these circumstances, counsel determined his punishment defense theory should be that Woods was the victim of an extraordinarily poor upbringing, receiving little if any affection, structure, and guidance in his youth, and began to spiral downward into drug abuse, self mutilation, and eventually anti-social behavior. Had someone intervened in a positive way for a significant period of time before the murders occurred, Woods might have been able to reverse his downward spiral, but no one did. Woods was responsible for his actions, but he would not be a future danger as long as he is kept in prison because he would not have unsupervised freedom and access to drugs, which were the root of his problems. In addition, with therapy he could be rehabilitated.

---

[1] Counsel stated: [The prosecution] told us in no certain terms that whatever evidence we intended to offer that Woods was somehow not responsible for the things he had done would be met with rebuttal witnesses who would testify about Woods' violence growing up in Michigan . . . [and] if we intended to offer evidence that Mr. Woods had been a peace loving soul when he was a youth, they intended to offer evidence about how his home was searched after his involvement with weapons at school, the result of which was the discovery of bomb making material and the 'Anarchist's Cookbook.' The biggest fear I had in offering testimony of a peace-loving disposition on the part of Mr. Woods was the fact that his ex-fiancee would undoubtedly be called to rebut these claims. . . . Our investigation had turned up early on an online diary of some sort kept by her, in which she explains the nature of their relationship, which can only be described as drug-fueled and violent. . . . [B]y keeping Mr Woods' family and old friends off the stand, we prevented them from being impeached with whether or not they knew Mr. Woods claimed to be a practicing Satanist, even as a youth. In fact, if memory serves, we managed to keep any extensive claims of Satanism and youthful violence in Michigan out of evidence with our strategy.

State *habeas* transcript ("SHTr") Vol. 5, pp. 572-73.

Woods's mother refused to testify that her parenting was poor, so the defense decided not to call her as a witness, and the mitigation expert they planned to call as a witness told them that, after meeting with Woods, she could not opine that there was not a probability that he would be dangerous in the future, and that no credible expert who examined Woods would be able to give such an opinion.  Accordingly,  trial counsel decided to present their defense by having a social worker who had never met Woods explain, based upon the incidents in Woods's psychiatric records, how the lack of appropriate parenting, lack of structure, and lack of intervention contributed to, and failed to arrest his decline, and how he was still salvageable, without actually opining as to the probability that he would be dangerous in the future.

A decision not to investigate is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation, and it must therefore be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Wiggins*, 539 U.S. at 521-22. The state court concluded that because defense counsel was aware of the vast majority of the bad things that Woods's family and friends could have said about him, because he knew that the prosecution was also aware of them, had many witnesses who could so testify, and intended to introduce their testimony to rebut any evidence Woods introduced attempting to minimize his responsibility or establish his good character, his decision to present a narrow case through expert testimony was reasonable, and because further investigation of the potential evidence available from family members and friends was not needed to prepare and present this defense, the decision not to conduct such investigation was based upon reasonable professional judgment.  *See Ex parte Woods*, 176 S.W.2d 224, 227-28 (Tex. Crim. App. 2005).

The Court disagrees. Given that counsel's strategy, in his own words, was to "demonstrate to the jury the extraordinarily poor upbringing Mr. Woods's mother exposed him to," and to "present Mr. Woods's past in the best light possible, which meant presenting a clear and objective viewpoint of his mother's failings," and given that Woods's mother disagreed with that characterization, the reasonable professional judgment should have been to at least attempt to interview Woods's siblings. For example, relying on the reports, the defense's expert witness testified that Woods's mother interfered with his stepfather's attempts to impose structure by reporting the stepfather to Child Protective Services ("CPS") for child abuse, *see* Trial Transcript "TTr" Vol. 24, pp. 119-20, while Woods's brothers Bryan and Daniel stated in their affidavits that their stepfather beat them arbitrarily, and severely. *See* SHTr Vol. 2, pp. 236-44. Investigating whether Woods's mother was trying to interfere with his step-father's attempt to introduce structure and discipline or trying to protect her children from his abuse would seem necessary to obtaining an accurate picture of Woods's mother's role in his upbringing. Thus, the state court's determination that Woods's trial counsel's failure to conduct a more thorough investigation into his family background was not deficient performance was unreasonable.

Because the state court's finding that Woods did not establish the deficient performance element of the *Wiggins* test was unreasonable, the Court must analyze whether he has established the prejudice element. It is somewhat unclear whether the state court made a finding regarding this element when it said: "It is entirely reasonable to conclude that a Texas jury would be singularly unimpressed by the sordid details of [Woods's] background and bad character traits." *Ex parte Woods*, 176 S.W.3d at 228. This statement could be interpreted as meaning that it would have been reasonable for defense counsel to decide not to invite rebuttal evidence by presenting testimony from

his friends and acquaintances. It could also be interpreted as meaning that there is not a reasonable probability that the result in Woods's case would have been different had defense counsel presented such testimony and the prosecution presented its rebuttal evidence. Because the author of the state court opinion placed the statement between two other statements about the reasonableness of counsel's judgment, however, the Court finds that the statement should not be interpreted as a finding on the prejudice element. Accordingly, the Court will analyze the prejudice issue *de novo*. *See Miller,* 200 F.3d at 281 n.4.

The issue for the Court is whether, had counsel interviewed Woods's siblings about the alleged physical abuse by their stepfather, there is a reasonable probability that the result in his case would have been different. The Court sees two problems. First, defense counsel's strategy was to portray Woods's mother as unfeeling and indifferent. They opted to spin the abuse report incident as her making an untrue report, apparently to cause problems for her boys' stepfather, rather than to protect them. Introducing testimony by Woods's brothers that the alleged physical abuse was in fact real would have severely weakened that strategy. Second, even had Woods's brothers testified, there would still be a dispute as to whether they had in fact been abused, since CPS found the charges unsubstantiated. Because it is unclear whether counsel would have presented this testimony, even if he had known about it, and it is unclear whether it would have been credible, the Court cannot find that there is a reasonable probability that, had counsel more thoroughly investigated Woods's upbringing from the standpoint of his siblings, the result in the punishment determination phase of his trial would have been different.

Because the state court's rejection of Woods's first claim was not based upon a decision which was contrary to, or the result of an unreasonable application of, clearly established federal law,

as determined by the Supreme Court of the United States in *Wiggins*, or the result of an unreasonable determination of the facts in light of the evidence presented in the state post-conviction proceedings, the Court denies this claim.

**Denial of due process of law: presenting false testimony**

Woods's second claim is that he was denied due process of law when the prosecution presented false or misleading testimony by witness Melissa Byrom. This claim was denied on the merits by the state court, *see* SHT Vol. 6, p. 705-07, Findings of Fact 21-28 and p. 716-17, Conclusion of Law 2, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Melissa Byrom testified that she ran into Woods, who was with a friend of hers, on approximately May 5, 2001, and that Woods offered to pay for her gas and pay for an oil change for her car if she would drive him to New Orleans. She and Woods, along with two of their friends, left the next morning, and she ended up staying there for three or four days. During that time, she heard Woods, on two occasions, say that he had killed two people in Dallas. She became scared, drove back to her house in Texas, and on May 15, 2001, she made a statement to the police. On cross-examination, she admitted that, in her May 15, 2001 statement, she only mentioned one occasion in which she heard Woods say to another person that he had killed people in Dallas. She also stated that she thought she may have had a beer or something during the time she was in New Orleans.

Woods contends that Byrom's testimony was false in two respects. First, according to her affidavit, by the time of trial she did not remember Woods making any statements about killing people in Dallas, and she only testified to this effect because she was pressured by a detective, who

told her she needed to say what was on the piece of paper in front of her. Byrom stated that she did not know what the piece of paper was, but it could have been the statement she gave. Byrom testified that she felt "pressured" by the detective and that she testified at trial that she might have had a beer because the detective told her to say it, but the truth was that while she was in New Orleans, she drank at least three 40 oz. beers.

It is well settled that the prosecution cannot present testimony it knows to be false, *see Mooney v. Holohan*, 294 U.S. 103, 112 (1935) and must correct testimony which it knows to be false. *See Alcorta v. Texas,* 355 U.S. 28, 31 (1957). In the present case, Woods claims the prosecution committed both violations, but a close comparison of Byrom's testimony and her affidavit shows that it did neither. While Byrom states that she felt pressured by the detective, she states in her affidavit that the detective attempted to refresh her memory by showing her her own written statement, after she said she could not remember what had happened. Similarly, while she states that the detective told her to say that she had a beer, she never states that she told him she actually had three 40 oz. beers.

Byrom may have felt she was being coerced into testifying to things she said in her statement but could no longer remember. Indeed, she stated in her affidavit that "Detective Tobler implied that if I said something earlier and now I can't remember, I could get into trouble." Because Byrom does not say what the detective actually said to her, however, the implications of his statements were determined subjectively by Byrom, rather than objectively. This is insufficient to establish that Byrom was instructed to give false testimony. Indeed, the defense was provided with a copy of her May 15, 2001 statement to the police and cross-examined her at length on the discrepancies between her statement and her testimony and on her memory in general.

Because Woods did not establish that the prosecution knew that Byrom's testimony was false, the state court's denial of this claim was neither contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Mooney* and *Alcorta*. The Court denies Woods's second claim.

**Denial of due process of law: withholding exculpatory evidence**

Woods's third claim is that he was denied due process of law when the state withheld testimony which would have impeached witness Melissa Byrom. This claim was denied on the merits by the state court, *see* SHT Vol. 6, p. 707-09, Findings of Fact 29-39 and p. 717, Conclusion of Law 2, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Woods contends that the prosecution failed to reveal to the defense that Byrom had drank at least three 40 oz. beers during her three or four days in New Orleans. As explained in the analysis of the previous claim, however, Byrom did not state in her affidavit that she told any of the members of the prosecution team this fact. While the prosecution must disclose impeachment evidence if such evidence is material, *see United States v. Bagley*, 473 U.S. 667, 678 (1985), in the present case Woods has not established that the prosecution was aware that during her time in New Orleans Byrom had drank at least three 40 oz. beers.

In the alternative, assuming *arguendo* that the prosecution did know that Byrom drank at least three 40 oz. beers, Woods would not be entitled to relief unless he could establish that there was a reasonable probability that the result in his trial would have been different if this evidence had been disclosed to the defense. *See Bagley,* 473 U.S. at 682. Considering that several other witnesses

testified that they also heard Woods say that he had committed the murders, Byrom's testimony does not appear to have been crucial to the verdict, and the amount of damage to her credibility from the fact that she drank at least three beers instead of one would be debatable.

Under either alternative analysis, the state court's denial of Woods's third claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Bagley*. The Court denies this claim.

**Ineffective assistance of counsel: failure to prepare for cross-examination**

Woods's fourth claim is that his trial counsel rendered ineffective assistance by failing to interview witness Melissa Byrom before his trial began. This claim was denied on the merits by the state court, *see* SHT Vol. 6, p. 707-09, Findings of Fact 29-39 and pp. 716-17, Conclusion of Law 1, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Assuming *arguendo* that his trial counsel's failure to interview Byrom constituted deficient performance, the issue for the Court is whether the result in Woods's capital murder trial would have been different had they interviewed her. *See Wiggins*, 539 U.S. at 521.

Had defense counsel interviewed Byrom, they would have learned that her memory of the events had faded since she gave her statement to police, and they may also have learned that she drank at least three 40 oz. beers in three or four days. As explained in the previous two claims, because Byrom's testimony about what Woods said was cumulative, there is not a reasonable probability that, had her testimony been impeached on both of these points, the result in Woods's capital murder trial would have been different. Because Woods cannot establish the prejudice

14

element of the *Wiggins* test, the state court's denial of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. The Court denies Woods's fourth claim.

**Ineffective assistance of counsel: failure to present impeachment evidence**

Woods's fifth claim is that his trial counsel rendered ineffective assistance by failing to locate, interview and present testimony from witness Kim Watson. Because this claim was denied on the merits by the state court, *see* SHT Vol. 6 p. 710, Findings of Fact Nos. 40-48 and pp. 716-17, Conclusion of Law 1, the issue for the Court is whether the state court's decision was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.[2] As with the previous claim, the Court assumes *arguendo* that defense counsel's failure to interview Watson constituted deficient performance. The issue for the Court is whether the result in Woods's capital murder trial would have been different had they interviewed her.

Woods contends that Watson would have testified that she traveled to New Orleans with Byrom and Woods and she never heard him say anything about killing anyone or threatening anyone. It is unclear whether Watson's testimony directly contradicts Byrom's testimony, in that it does not preclude the possibility that Watson was not present on the occasions that Byrom heard Woods speak about killing two people in Dallas. Moreover, even had the jury not credited Byrom's testimony, because her testimony was cumulative, there is not a reasonable probability that, had defense counsel located, interviewed, and presented the testimony of Kim Watson, the result in his capital murder trial would have been different.

_____

[2] Although the basis for the state court's decision is found in its findings of fact, the determinations of deficient performance and prejudice under *Wiggins* are mixed questions of law and fact. Such questions are reviewed under 28 U.S.C. § 2254 (d)(1).

Because Woods cannot establish the prejudice prong of the *Wiggins* ineffective assistance of counsel test, the state court's denial of Woods's fifth claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Wiggins*. The Court denies Woods's fifth claim.

**Denial of due process of law: presentation of false evidence**

Woods's sixth claim is that he was denied due process of law when the prosecution presented false or misleading testimony by witnesses Whitney Rios and Staci Schwartz. This claim was denied on the merits by the state court, *see* SHT Vol. 6, p. 711-12, Findings of Fact 49-58 and p.717, Conclusion of Law 2, so the issue for this Court is whether the state court's decision is based upon an unreasonable determination of the facts in light of the evidence presented to the state court.

The prosecution called Whitney Rios and Stacy Schwartz, who each testified that the day after the murders, Woods said that he and Marcus Rhodes had killed Whitehead and Brosz. The conversations took place at separate times. Rios testified that during her conversation with Woods, he was wearing a baseball cap that she recognized as one that Whitehead had worn. *See* TTr Vol. 20, p. 215. Schwartz testified that during her conversation with Woods, when she said she did not believe him, he explained the crime in detail to her, and then put Whitehead's yellow baseball-style cap on her head. Schwartz's testimony was:

Q. Did [Woods] show you anything to try to make you believe him?

A. Oh, yeah. He showed me Ron's hat that he always wore, a yellow hat. And he actually put it on my head, and I kind of freaked out and threw it back at him.

On cross-examination, Schwartz testified:

Q. So he was elaborating?

A. Right. And he also had the hat and stuff that he put on my head.

16

Q. And you felt for sure that that was Ron's hat?

A. Oh yeah, definitely.

Q. Definitely was Ron's hat?

A. Absolutely.

TTr Vol. 20, pp.251 and 261-62.   At some time after the trial, Schwartz was shown a crime scene photograph which showed Whitehead's yellow hat laying in the grass not far from his body.   She nevertheless executed an affidavit in July of 2004 in which she reaffirmed that the hat in Woods's possession the day after the murders was the same hat that was in the crime scene photograph, and that as far as she knew, Whitehead owned only one hat.  *See* SHTr Vol. 3, pp. 309-10.  Woods also presented the affidavit of Nadia Yasmeen ("Jasmine") Caminero, who, although she did not testify at trial, said she was with Rios when she spoke with Woods, and that she saw Woods wearing the same hat that was in the crime scene photograph, and as far as she knew it was the only hat of that type that he owned.  *See* SHTr Vol. 3, p. 305-06.

As the Court explained in its analysis of Woods's third claim, the prosecution cannot present testimony it knows to be false, *see Mooney,* 294 U.S. at 112, and must correct testimony which it knows to be false,  *see Alcorta,* 355 U.S. at 31.  In the present case, the Court assumes that Woods did not return to the crime scene after the photograph was taken and take  Whitehead's hat, and therefore, the prosecution would have known that the hat Schwartz and Rios testified that they saw Woods wearing the day after the murders was not the same hat that was photographed at the murder scene.

The prosecution took the position in closing arguments that Whitehead owned more than one yellow hat, and that Woods obtained the other hat when Marcus Rhodes took Whitehead's backpack

from Brosz's car after the killings. Neither Schwartz nor Rios testified at trial that they believed that Whitehead owned only one yellow hat, and there is no evidence that the prosecution knew that they believed Whitehead owned only one yellow hat.[3] Accordingly, the trial court's findings - that the prosecution did not knowingly present false testimony by Schwartz and Rios, and that Schwartz and Rios did not testify falsely when they said that the day after the murders Woods was wearing a yellow hat which they believed was Whitehead's - were not unreasonable in light of the evidence presented in the state court post-conviction proceedings. The Court denies Woods's sixth claim.

**Ineffective assistance of counsel: failing to impeach witnesses**

Woods's seventh claim is that his trial counsel rendered ineffective assistance by failing to impeach witnesses Whitney Rios and Staci Schwartz about the issue of Whitehead's hat. This claim was denied on the merits by the state court, *see* SHT Vol. 6, p. 711-12, Findings of Fact 49-59 and p. 716-17, Conclusion of Law 1, so the issue for the Court is whether the state court's decision was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

In the present case, the state court found that the defense's decision not to point out the discrepancy between Rios's and Schwartz's testimony and the crime scene photograph "constituted sound trial strategy." *See* SHTr. Vol. 6, p.712, Finding of Fact 59. In his affidavit, however, defense counsel Jerry Parr stated:

> I do not recall knowing that the cap the women testified about was in the crime scene photos. It is my recollection that those crime scene photos had been provided to the defense and that I had a copy of them. If I had realized that the cap the women mentioned, as the one Woods was wearing after the murders, was the same cap [as]

---

[3] Indeed, defense attorney Derek Adame stated in his affidavit: "I can say that there was never any claim that Mr. Whitehead owned or wore only one baseball cap. In fact, he was known to wear several different caps, and one of them happened to be the one in Mr. Woods' possession as explained by Ms. Rios and Ms. Schwartz." *See* SHTr Vol. 5, p. 574.

in the crime scene photo, I would have attempted to impeach them with that photo. However, I do not know whether it was the same cap.

SHTr. Vol. 5, pp. 539-40. It was unreasonable to find, as the state court found, that failing to realize that an opportunity for cross-examination exists constitutes sound trial strategy. On the other hand, Parr's failure to realize that Rios and Schwartz both believed that the cap they saw Woods wearing was the cap in the crime scene photos, rather than just the same type of cap, and believed that Whitehead did not own another identical or similar type of cap was not unreasonable, considering that there is no possibility whatsoever that Rios's and Schwartz's unarticulated beliefs could have been true. Moreover, co-counsel believed that Whitehead owned more than one yellow cap, and Woods, who clearly knew what the truth was, does not contend that he informed Parr that Rios and Schwartz were either mistaken or lying. Accordingly, the state court's conclusion- that Parr's failure to impeach Rios and Schwartz on the discrepancy between their unspoken beliefs about Whitehead's cap and the crime scene photos did not fall below an objective standard of reasonableness - was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Wiggins*. The Court denies Woods's seventh claim.

**Denial of right to counsel**

Woods's eighth claim is that he was denied his right to the assistance of counsel during custodial interrogation when inmate Gary Don Franks ("Franks") elicited information from him while he was incarcerated. This claim was denied on the merits by the state court, SHTr. Vol. 6, p.713-14, Findings of Fact 60-65 and p.717, Conclusion of Law 3, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

19

A criminal defendant may not have used against him at trial evidence of his own incriminating words, which federal agents deliberately and surreptitiously elicited from him after he had been indicted and in the absence of his counsel. *Massiah v. United States*, 377 U.S. 201, 206 (1964). In the present case, Woods contends that Franks, his cellmate, attempted to get him to talk about the killings, at the behest of the state, who then rewarded Franks by dismissing drug offense charges that were pending against him.

It is undisputed that Franks had numerous conversations with Woods, testified at his trial, and that the charges were dropped after he testified. Franks and his attorney stated in affidavits, however, that Franks did not attempt to elicit information from Woods, and that he had his attorney contact the prosecution and offer to testify without expecting, or being promised, anything in return.

Franks and his attorney would have at least hoped for, and in fact harbored some expectation of, receiving something in return for his testimony, even though no promise was made by the government. The issue is whether in these circumstances Franks should be considered a "government agent" for purposes of *Massiah*. An individual is a government agent where he was promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from the defendant and he acted pursuant to instructions from the state, or otherwise submitted to the state's control. *Creel v. Johnson,* 162 F.3d 385, 393 (5th Cir. 1998), *cert. denied*, 526 U.S. 1148 (1999). In the present case, while the Court agrees with Woods that Franks appears to be "an individual who knew how to manipulate individuals, as well as the criminal justice system for his benefit," *see* Response and motion in opposition to summary judgment (Docket #20) p. 125, there is no evidence that Franks acted pursuant to instructions from the state, or

otherwise submitted to the state's control. *Cf. United States. v. York*, 933 F.2d 1343, 1358 (7th Cir.), *cert. denied*, 502 U.S. 916 (1991) (test for agency is whether government tells inmate to collect information). Since Franks was not a government agent, the state court's denial of this claim was neither contrary to, not the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Massiah*. The Court denies Woods's eighth claim.

**Ineffective assistance of counsel: failure to impeach evidence**

Woods's ninth claim is that his trial counsel rendered ineffective assistance by failing to impeach his own inculpatory statements. This claim was denied on the merits by the state court, *see* SHT Vol. 6 p.714, Findings of Fact 64 and 65 and pp. 716-17, Conclusion of Law 1, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Woods's lead defense counsel for the guilt-determination phase of his trial was Jerry Parr. Parr said in his affidavit that after being presented by the prosecution with a list of approximately 100 witnesses, he asked Woods specifically if Woods had made any statements to any of the witnesses about the murders, and Woods denied making any incriminating statements to any of them. Parr stated:

> Unfortunately, Mr. Woods' false statements to his attorneys that he had not made any admissions eliminated the development of evidence that the statements testified about at trial were the product of his propensity for untruthfulness. Perhaps, if he had admitted to his attorneys that he had made a series of admissions about the murders and that those admissions were false, evidence that he was a liar, rather than a killer, could have been developed.

SHTr. Vol. 5, p. 540. The Court infers from Parr's affidavit that he did realize that witnesses were going to testify that Woods made inculpatory statements to them, but he was prevented from developing a response by Woods's lying about making incriminating statements. Woods contends that the defense could have, and indeed should have, argued that he was a habitual liar and attempted to prove this proposition by contacting friends and acquaintances from his past.

The Court agrees that a reasonable defense strategy would have to include an explanation for Woods's statements that he killed the victims, regardless of whether Woods was truthful or helpful to his attorneys. The record, however, shows that the defense did make such an explanation, albeit implicitly. In his closing argument, while attempting to raise a reasonable doubt by attacking the prosecution's evidence, Parr said:

> And here, too, the government says Woods comes in, Mike comes in, and immediately starts talking about his Mafia connections. And it doesn't matter whether it's true or not. It doesn't matter if he lies about it because he wants people to believe the admissions. And then they say, but if he makes admissions about killing people, then you should believe that. . . . you know, just because he's making all these things up about Mafia connections and they're exaggerated and people know they're exaggerated, that you shouldn't believe - that you wouldn't believe that but that you should believe [his] other statements.

TTr. Vol. 23, pp. 39-40. It appears from this passage that defense counsel attempted to impeach Woods's inculpatory statements by juxtaposing them with similar statements he made that the jury would know were deliberate falsehoods. Because the strategy which Woods now says his counsel should have employed does not seem inherently more persuasive than the strategy his counsel actually did employ, there is not a reasonable probability that, had the defense conducted the investigation and presented the evidence Woods contends they should have, the result in the guilt-determination phase of his trial would have been different. Therefore, the state court's rejection of this claim was neither contrary to, or the result of an unreasonable application of, clearly established

federal law, as determined by the Supreme Court of the United States in *Wiggins*.  The Court denies

Woods's ninth claim.

**Denial of right to confront witness**

Woods's tenth claim is that he was denied the right to confront and cross-examine co-

perpetrator Marcus Rhodes about Rhodes's statements to David Samuelson.  This claim was denied

on the merits by the state court, *see Woods v. State*, 152 S.W.3d at 113-14, so the issue for this Court

is whether the state court's decision is contrary to, or the result of an unreasonable application of,

clearly established federal law, as determined by the Supreme Court of the United States.

David Samuelson testified that on the night of the murders, Marcus Rhodes told him that "he

had a job to do for [Wilson] that he did not want to do" and that the job was "tonight."  TTr.Vol. 20,

pp. 155-56.  Because  Rhodes had invoked his rights under the Fifth Amendment not to testify at

Woods's trial, Woods was not allowed to cross-examine Rhodes.  Woods objected to Samuelson's

testimony on the ground that admitting his hearsay testimony about Rhodes's statement would

violate Woods's right to confront witnesses against him.

The admission of a hearsay statement in a criminal case does not violate the defendant's right

to confront the statement's maker,  if that witness is unavailable to be cross-examined, and the

statement bears sufficient indicia of reliability.  *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).[4]  In the

present case, the Texas Court of Criminal Appeals found Rhodes's statements reliable because they

were made to a friend, shortly before the crime occurred, without any motive to shift blame to

another, and without any attempt to minimize Rhodes's own involvement in the crime.  According

---

[4] An exception to this rule was announced in *Crawford v. Washington*, 541 U.S. 36 (2004): If the hearsay statement was testimonial in nature, it was inadmissible unless the defendant had a prior opportunity to cross-examine the declarant.  In the present case, however, Woods does not allege that Rhodes's statements were testimonial in nature.

to the court, "[T]he timing and spontaneity of the statements tend to establish their reliability." *Woods*, 152 S.W.3d at 113.

Woods contends that in order to have sufficient indicia of reliability to be admitted without running afoul of the confrontation clause, Rhodes's statements would, at a minimum, have to be against his interest, or statements which would subject him to disgrace, ridicule or hatred, and Rhodes's statement did not. Accordingly, he contends that Rhodes's statement to Samuelson has none of the indicia of reliability that would justify its admission as an exception to Woods's right to confront and cross-examine Rhodes.

The Court disagrees. A statement against its maker's penal or pecuniary interest has indicia of reliability because it is considered inherently reliable. Indicia of reliability, however, can be found in circumstances beyond the actual words being spoken, such as the circumstances in which the declarant finds himself or herself at the time the declaration is made. *See, e.g.*, FED. R. EVID. 804 (b)(2) (statements made under belief of impending death). Woods has not cited, and this Court has not found, Supreme Court authority on whether the timing and spontaneity factors found by the Texas Court of Criminal Appeals are sufficient indicia of reliability that the admission of Rhodes's out of court statements did not violate Woods's rights under the Confrontation Clause. Accordingly, this Court cannot find that the state court's adjudication of this claim was either contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Roberts*. The Court denies Woods's tenth claim.

**Denial of right to confront witness**

Woods's eleventh claim is that he was denied the right to confront and cross-examine co-perpetrator Marcus Rhodes about Rhodes's statements to Staci Schwartz. This claim was denied on

the merits by the state court, *see Woods*, 152 S.W.3d at 113-14, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Staci Schwartz testified that on the day after the murders, Marcus Rhodes and Woods told her they had killed Whitehead and Brosz, and Rhodes showed her their property in the trunk of his car. TTr. Vol. 20, pp. 245-48, 252. Rhodes told Schwartz that they had used Brosz's credit card to buy tickets in Samuelson's name to make him look guilty. *Id.* at 257-58. Because Rhodes had invoked his Fifth Amendment right not to testify at Woods's trial, Woods was not allowed to cross-examine him about this statement. Woods objected to Schwartz's testimony on the ground that admitting her testimony about Rhodes's statement would violate Woods's right to confront witnesses against him.

As set forth in the analysis of the previous claim, the general rule is that hearsay statements made by a declarant who is unavailable to be cross-examined may be admitted against a defendant if the statements bear sufficient indicia of reliability, and one example of such a statement is a statement which is against the penal interests of the declarant. In the present case, Rhodes's statements to Schwartz were clearly against his own penal interest; in addition, the Texas Court of Criminal Appeals found Rhodes's statements reliable because they were made to a friend, shortly after the crime occurred, without any motive to shift blame to another, and without any attempt to minimize Rhodes's own involvement in the crime.

A statement that incriminates another defendant is not considered inherently reliable simply because it is made in the context of an overall self-incriminating statement. *Williamson v. United States*, 512 U.S. 594, 599-600 (1994) Woods contends that under *Williamson* only the part of

Rhodes's statements that were against Rhodes's own interests - that he killed Brosz and that he used her credit cards to frame Samuelson - could be considered reliable enough to be admissible.

The Court again disagrees. In *Williamson*, an individual who had been arrested for transporting drugs stated, in the context of his confession to police, that the defendant, not he, was the owner of the drugs. The statement that the defendant was the owner of the drugs did not by itself, incriminate the declarant. In the present case, however, Rhodes's statement that they (he and Woods) killed the victims and used their credit cards to frame Samuelson for the murder did incriminate Rhodes. Because the facts of the present case are distinguishable from those of *Williamson*, the Court finds that the state court's adjudication of this claim was neither contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Williamson* and *Roberts*. The Court denies Woods's eleventh claim.

**Ineffective assistance of counsel: failure to present exculpatory evidence**

Woods's twelfth claim is that his trial counsel rendered ineffective assistance by failing to present evidence that an alternative suspect committed the murders. This claim was denied on the merits by the state court, *see* SHT Vol. 6, p. 715, Findings of Fact 69-72 and p. 716-17, Conclusion of Law 1, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

There are two problems with Woods's argument. First, he cites no authority that under prevailing professional norms, it is considered unreasonable for an attorney who raises an alibi defense not to offer evidence about an alternative suspect to the crime. Second, at trial the state

introduced evidence that Marcus Rhodes participated in the murders. Considering that Woods was seen with Rhodes and the victims shortly before they were killed, and Rhodes was arrested in possession of the victims' property shortly after the killing, defense counsel's strategic decision to contend that Rhodes was the actual killer of Whitehead and Brosz does not appear unreasonable. Because Woods has failed to establish that his defense counsel's failure to offer evidence that Jeremy Stark may have committed the murders was unreasonable, it is unnecessary for the Court to analyze whether, had the defense offered such evidence, there is a reasonable probability that the result in the punishment determination phase of Woods's trial would have been different. The state court's rejection of Woods's twelfth claim was neither contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Wiggins*. The Court denies this claim.

**Ineffective assistance of counsel: failure to appeal admission of evidence**

Woods's thirteenth claim is that his appellate counsel rendered ineffective assistance by failing to appeal the trial court's admission of hearsay evidence. This claim was denied on the merits by the state court, *see* SHT Vol. 6, p. 715-16, Findings of Fact 73-75 and p. 716-17, Conclusion of Law 1, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

If a defendant's appellate counsel fails to raise a meritorious claim and there is a reasonable probability that he would have prevailed on his appeal if counsel had raised the claim, the defendant is entitled to a new appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Woods contends that his claim that the trial court erroneously denied a hearsay objection raised by his trial counsel was

meritorious, and, had it been raised on appeal, there is a reasonable probability that it would have been successful.

During the guilt-determination phase of his capital trial, Woods raised an alibi defense. Leslie Batteau testified that he and Woods were asleep in an abandoned building at the time of the murders and did not learn of the murders until the next day, when they encountered Marcus Rhodes at the Insomnia coffee bar. The prosecution questioned Batteau as to whether Woods ever told him that he (Woods) and Rhodes committed the killings, and whether he (Batteau) had said to anyone else that Woods had told him that he and Rhodes killed Whitehead and Brosz. During the state's rebuttal case, the prosecution recalled David Samuelson and elicited the following testimony:

> Q: What did Les tell you [Woods] had told him about the murder of [Whitehead] and [Brosz]?
>
> [Defense counsel]: Objection, judge. It calls for hearsay.
>
> [The Court]: Overruled.
>
> A. He said that they drove up -
>
> Q: Who is "they"?
>
> A: Marcus and Halo in the front with Ron and Beth's car behind them, and they got out. Ron said, you brought me to the perfect place to set me up. And then that was the last thing he ever said.
>
> Q: Who did Les tell you killed Ron?
>
> A: [Woods].
>
> Q: Who did Les - did Les ever tell you he was with [Woods] the night of the murders?
>
> A: No.
>
> Q: Has Les ever said anything to you about being at The Squat with [Woods] the night of the murders?

A: No.

Q: Who did Les tell you murdered Ron and Beth?

A: [Woods].

TTr. Vol. 22, pp. 149-50.  Woods claimed that the trial court erred by denying his defense counsel's

hearsay objection, and his appellate counsel rendered ineffective assistance by not raising the trial

court's erroneous ruling in his direct appeal.

The state court found that the trial court's overruling the defense's hearsay objection was

proper because Samuelson's testimony was not being offered to prove whether Woods and Rhodes

killed Whitehead and Brosz; rather, it was being offered to impeach Batteau's credibility because

it was a prior  statement he made that was inconsistent with his trial testimony.[5]  Woods contends

that Samuelson's testimony was still objectionable under TEX. R. EVID. 613(a) because during

Batteau's cross-examination he was not told the time, place, and specific content of the statement

he allegedly made to Samuelson and then given the opportunity to deny or explain it.

The problem with Woods's argument is that trial counsel did not object on the basis of TEX.

R. EVID. 613(a).  As a result, this issue was not preserved for  appeal.  *See Parson v. State*, 193

S.W.3d 116, 125 (Tex. Ct. App. – Texarkana 2006).  Thus, there is not a reasonable probability that

the Texas Court of Criminal Appeals would have given relief to Woods because it would have

considered this claim to have been waived by his failure to object on the proper grounds.

Accordingly,   Woods cannot establish the prejudice element of the *Robbins* test.  *Cf. Ries v.

Quarterman*, 522 F.3d 517, 533 (5th Cir.), *cert. denied*, 129 S.Ct. 485 (2008)(because penalty-phase

objection was not clearly preserved, federal court cannot say that state court's rejection of ineffective

---

[5] Woods could have asked for a limiting instruction to this effect.

assistance of counsel claim was unreasonable). The state court's rejection of Woods's thirteenth claim was neither contrary to nor the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Robbins*. The Court denies this claim.

**Ineffective assistance of counsel: failure to object to inadmissible evidence**

Woods's fourteenth claim is that his trial counsel rendered ineffective assistance by failing to object to Samuelson's testimony on the ground that the state had not laid the proper predicate for its admission during their cross-examination of Batteau. This claim was denied on the merits by the state court, *see* SHT Vol. 6, pp.715-16, Findings of Fact 73-75 and pp.716-17, Conclusion of Law 1, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Assuming *arguendo* that defense counsel's failure to object on proper grounds constituted deficient performance, the issue for the Court is whether there is a reasonable probability that, had the proper objection been made, the result in Woods's trial would have been different.

The first problem with Woods's claim is that it is not clear that the trial court would have sustained a Rule 613 (a) objection, since that provision appears to apply only when the witness who is being impeached is testifying, not when his testimony is being rebutted by a different witness, as in this case. The second problem is that even if the objection were sustained, the prosecution could simply have recalled Batteau and laid the proper predicate for Samuelson's testimony. Finally, because the statements Samuelson said Batteau said Woods said were similar to statements that several other witnesses testified Woods said to them, the Court cannot say that either the admission or the exclusion of one more such statement would likely have had a significant impact on the jury.

For these reasons, there is not a reasonable probability that, had defense counsel objected to Samuelson's testimony on the basis of TEX. R. EVID. 613(a), the result in Woods's trial would have been different. Because Woods cannot establish the prejudice element of the *Wiggins* test, the state court's rejection of his claim was neither contrary to nor the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Wiggins*. The Court denies Woods's fourteenth claim.

**Denial of due process of law: inconsistent theories of co-defendant guilt**

Woods's fifteenth claim is that he was denied due process of law when the prosecution presented inconsistent theories of his and Marcus Rhodes's guilt. This claim was denied on the merits by the state court, *see* SHT Vol. 6, p. 716, Findings of Fact 76-78 and p.717, Conclusion of Law 5, so the issue for this Court is whether the state court's decision is contrary to or the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.

At the guilt-determination phase of Woods's trial, the prosecution argued that although Marcus Rhodes participated in the murders, and supplied the car and the guns, Woods planned the crime and did the fatal shootings. Later, Rhodes pled guilty to capital murder and received a life sentence. In Rhodes's sentencing proceedings, he stipulated that he intentionally or knowingly caused the death of Whitehead and Brosz by shooting them with a firearm.

Woods contends that it is fundamentally unfair for the state to present differing theories of culpability in separate trials of co-perpetrators. Because the Supreme Court of the United States has so far refused to take a position on this issue, *see Bradshaw v. Stumpf*, 545 U.S. 175, 187 (1980), the state court's rejection of this claim was neither contrary to or the result of an unreasonable

application of clearly established federal law, as determined by the Supreme Court of the United States. The Court denies Woods's fifteenth claim.

**Denial of due process of law: limiting juror *voir dire***

Woods's sixteenth claim is that he was denied due process of law when the trial court limited his *voir dire* of juror Keri Wyrick. This claim was denied on the merits by the state court, *see Woods,* 152 S.W.3d at 108-11, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

During *voir dire* of venire member Wyrick, the following exchange transpired:

Q. And it mentions on there if you find sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed. It says, "sufficient mitigating circumstance or circumstances." So do you understand that to mean that even one mitigating circumstance, if it's sufficient, is enough to award a life penalty instead of a death penalty?

A. I understand.

Q. Could you do that even if you'd already found a defendant guilty beyond a reasonable doubt of committing a capital murder, you'd found special issue number 1, that the State proved that beyond a reasonable doubt, that you found on special issue number two that the State proved that beyond a reasonable doubt? If the State did all that, could you still support and vote for a life punishment if you found a sufficient mitigating circumstance?

[Prosecutor]: I object to contracting.

[The Court]: Sustained, the way it's phrased.

Q. Would you be able to follow the law as to special issue number three if you found even one sufficient circumstance?

A. Yes.

TTr. Vol. 7, pp. 134-35. Defense counsel did not attempt to challenge Wyrick for cause and did not use a peremptorily challenge against her, and she was seated on the jury.

The Texas Court of Criminal Appeals found that the trial court erred in sustaining the objection, but found the error harmless because the defense asked a substantially similar question immediately thereafter. *Woods*, 152 S.W.3d at 109-10. Assuming *arguendo* that the trial court did err, an inmate is entitled to relief in *habeas corpus* only if the error had substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abramson*, 507 U.S. 619, 637-38 (1993).

In his brief in chief Woods does not even contend, much less explain why, the trial court's error in sustaining the prosecution's objection, but then allowing the defense to ask a similar though less specific question, had a substantial and injurious effect or influence in determining the jury's verdict. In his reply brief, Woods does not address this claim at all. Thus, the state court's denial of this claim was neither contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Brecht v. Abramson*. The Court denies Woods's sixteenth claim.

**Denial of due process of law: improper burden of proof**

Woods's seventeenth claim is that he was denied due process of law because the mitigation special issue implicitly places the burden of proof and persuasion on the defendant. This claim was denied on the merits by the state court, *see Woods*, 152 S.W.3d at 119-21, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Under Texas law, in order for Woods to be sentenced to death, the jury had to find beyond a reasonable doubt that there was a probability that he would commit acts of criminal violence which would constitute a continuing threat to society, and that he either actually caused the death of the victims, or intended or anticipated that they would be killed. At that point, the jury had to find that taking into account all of the evidence, including the circumstances of the offense, Woods's character and background, and his personal moral culpability, there were not sufficient mitigating circumstances to warrant a sentence of life imprisonment, rather than death. *See* TEX. CODE CRIM. PROC. Art. 37.01. The Code does not assign a burden of proof regarding the mitigating circumstances question, but the burden is implicitly placed upon the defendant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case. *See Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995), *cert. denied*, 519 U.S. 826 (1996).

Woods contends that this implicit burden conflicts with the reasoning of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002). In *Apprendi*, the Supreme Court of the United States, in reviewing a hate crime enhancement provision, held that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and must be proved beyond a reasonable doubt. *See Apprendi*, 530 U.S. at 469. In *Ring*, the Court held that the rule in *Apprendi* applied to the aggravating factors which make a capital murder eligible for the death penalty. *See Ring*, 536 U.S. at 609. Woods contends that the absence of mitigating circumstances is in essence an aggravating factor, so in order to be consistent with these precedents, Texas law must require the prosecution to prove, beyond a reasonable doubt, the absence of sufficient mitigating circumstances to justify imposing a life sentence.

In *Granados v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir.), *cert. denied*, 549 U.S. 1081 (2006), the United States Court of Appeals for the Fifth Circuit held that the Texas mitigation instruction did not violate either *Ring* or *Apprendi*. Based upon *Granados*, this Court finds that the state court's rejection of this claim was neither contrary to nor the result of an unreasonable application of clearly established federal law, as determined by those precedents. The Court denies Woods's seventeenth claim.

**Denial of right to remain silent**

Woods's eighteenth and final claim is that his right to due process and his right to remain silent were violated because jurors discussed his failing to testify at his trial. This claim was not fairly presented to the state courts, so it is unexhausted. Federal courts treat unexhausted claims as if the state court refused to hear them on procedural grounds. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). If it is not entirely clear that the state court would refuse to hear a successive petition containing the new claims, however, federal courts will allow the state court the first opportunity to consider them. *See Wilder v. Cockrell,* 274 F.3d 255, 262-63 (5th Cir. 2001). Accordingly, the initial inquiry for the Court is whether it is entirely clear that court would refuse to consider the merits of this claim if Woods were to return to state court and present it in a successive petition.

TEX. CODE CRIM. PROC. Art. 11.071 §5 provides that if a successive application for a writ of *habeas corpus* is filed after filing an initial application, a court may not consider the merits or grant relief on the application unless the application contains specific facts establishing that:

(1) the current claims and issues have not been presented previously because the factual or legal basis of the claim was unavailable on the date the applicant filed the initial application;

35

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the three sentencing issues.

In the present case, Woods does not contend that the factual or legal basis of his claim was not available at the time he filed his initial state post-conviction application for relief. Similarly, he does not allege that in the absence of any constitutional errors no rational juror could have voted to convict him or sentence him to death. Accordingly, it is entirely clear that the state court would have refused to reach the merits of this claim if it were presented to the state courts in a successive petition, and the Court will treat the claim as if it were procedurally defaulted in state court.

Federal courts generally do not review procedurally defaulted claims unless the applicant can establish either that he had good cause for failing to fairly present his claims, and he would be prejudiced by not being given an opportunity to do so in the federal court, or that the federal court's failing to address the claims on their merits would result in a fundamental miscarriage of justice, because he is actually innocent of the offense. *See Coleman v. Thompson,* 501 U.S. 722, 749-50 (1991). Woods does not contend that he had good cause for failing to raise this claim in his initial state post-conviction application for relief, and he does not contend that he is actually innocent of killing Whitehead and Brosz, so the Court will not review the merits of this claim. Woods's final claim will be dismissed.

# CONCLUSION

For the above reasons, the Court **DENIES** claims one through seventeen and **DISMISSES** with prejudice the eighteenth and final claim in Woods's application for a writ of *habeas corpus*. A Final Judgment will be entered.

**So ORDERED and SIGNED this 26th day of August, 2009.**

_____
**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**